Filed 11/19/19; Certified for Publication 12/6/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID BERNSTEIN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHIA LABEOUF,<br><br>    Defendant and Appellant. | B288054<br><br>Los Angeles County<br>Super. Ct. No. BC663207 |

APPEAL from an order of the Superior Court of Los Angeles County, Laura A. Matz, Judge. Affirmed.

Lavely & Singer, Brian G. Wolf and David B. Jonelis for Defendant and Appellant.

Shaw Koepke & Satter, Jens B. Koepke; Law Offices of Bruce A. Wernik, Bruce A. Wernik and Frederic L.F. Hamilton for Plaintiff and Respondent.

_____

## INTRODUCTION

This lawsuit arises out of an altercation between plaintiff David Bernstein, a bartender, and defendant Shia LaBeouf, an actor. LaBeouf confronted Bernstein and called him a "racist" after Bernstein refused to serve LaBeouf and his companion alcohol. Video footage of the incident was later posted on the internet and broadcast on television. Bernstein sued LaBeouf for assault, slander, and intentional infliction of emotional distress. LaBeouf filed a special motion to strike Bernstein's first amended complaint under Code of Civil Procedure[1] section 425.16 (anti-SLAPP statute), arguing the conduct giving rise to Bernstein's claims was protected speech-related activity concerning a matter of public interest. The trial court denied the motion in its entirety and LaBeouf appeals. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. The Incident

Around 9:45 p.m. on April 5, 2017, LaBeouf's companion, Mia Goth, went to the bar at Jerry's Famous Deli (Jerry's) in Studio City, where Bernstein worked, and tried to order alcoholic drinks. The bartenders refused to serve Goth because she appeared "significantly under the influence." Shortly thereafter, LaBeouf entered the bar and demanded the bartenders serve him and Goth alcohol. Bernstein refused to serve LaBeouf alcohol because he too appeared "significantly under the influence." LaBeouf became angry, pounded his fist on the bar counter, and yelled "[y]ou're not going to fucking serve me?"

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

2

LaBeouf then walked around the counter and entered the well area behind the bar, where the bartenders work. LaBeouf, who was "yelling at the top of his lungs," took several steps toward Bernstein. "[F]earful of an imminent attack," Bernstein grabbed a bottle of Grey Goose vodka and held it over his shoulder "to deter" LaBeouf. LaBeouf then stepped back and was escorted out of the restaurant by security.

As LaBeouf was being taken out of the restaurant, he shouted at Bernstein, "You Fucked Up," and called him a "Fucking Racist" and a "Fuckin' Racist Bitch." LaBeouf also told the "predominantly African-American crowd" to "Wake Up, this Motherfucker is a Racist."[2]

"Videotapes of [the] incident were published by TMZ and were circulated instantly world-wide to millions of people via television, internet, social and print media." After videos of the incident were circulated, "[t]here were many internet and social media posts supporting" LaBeouf. "On a near[ly] daily basis," customers whom Bernstein has never met called him " 'The Racist Bartender,' "and people Bernstein knows "have constantly been bringing up th[e] event."

## 2. Bernstein's Lawsuit

Bernstein sued LaBeouf for assault, slander per se, and intentional infliction of emotional distress. The assault claim was based on allegations that LaBeouf engaged in physically threatening conduct, including entering the well area behind Jerry's bar without permission, when he confronted Bernstein.

---

[2] There is no indication in the record that LaBeouf or Goth are African-American.

With respect to the slander claim, Bernstein alleged LaBeouf called him a "racist," without any basis in fact to support that statement, in front of a large crowd that was predominantly African-American. Finally, the intentional infliction of emotional distress claim was based on LaBeouf's conduct throughout the entire encounter, including his threatening physical conduct and his statements that Bernstein was a "racist."

LaBeouf filed a special motion to strike Bernstein's complaint under the anti-SLAPP statute (§ 425.16). With respect to his statements calling Bernstein a "racist," LaBeouf insisted they were protected speech under the anti-SLAPP statute because: (1) they occurred in a place open to the public—i.e., a restaurant; (2) they "were of 'public interest,' as evidenced by the fact that video footage of the [i]ncident was posted publicly on the TMZ website"; and (3) because LaBeouf is a celebrity, " '[t]he public's fascination with [him] and widespread interest in his personal life' render his day to day conduct 'a public issue or an issue of public interest.' " Alternatively, LaBeouf argued his statements addressed a matter of public interest because they contributed to the public debate on racism, since "it [is] axiomatic that racism and allegations of racial discrimination are matters of the highest public concern." As for his physical conduct, LaBeouf claimed it too was protected because it was used in furtherance of, or to "emphasize," his protected speech.

With respect to the second prong of the anti-SLAPP statute, LaBeouf argued Bernstein could not demonstrate a probability of prevailing on the merits of any of his claims. Among other things, LaBeouf asserted Bernstein could not prevail on his slander claim because LaBeouf's statements that Bernstein was a "racist" constituted nothing more than " 'mere

4

name calling.' " (Emphasis omitted.) LaBeouf did not submit any supporting evidence.

Bernstein opposed LaBeouf's motion. In support of his opposition, Bernstein submitted declarations from several customers who witnessed the incident at Jerry's, fellow Jerry's employees who were working during the incident, and a psychologist who diagnosed Bernstein with Post-Traumatic Stress Disorder because of the incident. The customers who submitted declarations on Bernstein's behalf stated they knew Bernstein because they frequented Jerry's. None of them had ever seen Bernstein engage in any racist conduct.[3]

Bernstein also submitted several newspaper articles documenting LaBeouf's various run-ins with law enforcement, as well as screenshots of several social media posts in which people comment on the incident at Jerry's and, in many of the posts, express their support for LaBeouf or call Bernstein a "racist." Finally, Bernstein filed a copy of the video of the TMZ broadcast covering the incident, which includes footage of LaBeouf's conduct inside Jerry's, a copy of a video of the incident recorded by one of Jerry's other employees, and copies of videos concerning LaBeouf's other public outbursts.

The court denied LaBeouf's anti-SLAPP motion. The court found LaBeouf failed to show any of the claims in Bernstein's complaint arose out of LaBeouf's "constitutional right of free speech in connection with a public issue or an issue of public interest." Rather, the court found the claims stemmed from "a

---

[3] We grant Bernstein's May 9, 2019 motion to augment the record with the corrected versions of several of the witnesses' declarations that he filed in the trial court but which LaBeouf omitted from the record on appeal.

private dispute between [LaBeouf] and [Bernstein] concerning [Bernstein's] refusal … to serve [LaBeouf] alcohol and [LaBeouf's] reaction." The court rejected LaBeouf's arguments that his statements calling Bernstein a "racist" contributed to the public debate on racism and that his celebrity status converted the dispute into a matter of public interest.

LaBeouf timely appealed the order denying his anti-SLAPP motion.

## DISCUSSION

LaBeouf contends each of Bernstein's claims arises out of activity protected by the anti-SLAPP statute because "what would have otherwise been an unremarkable and insignificant altercation between two individuals became a matter of significant and inherent public interest" due to "LaBeouf's celebrity status." LaBeouf also argues his statements address racial discrimination, "a hot-button topic of significant public concern." We are not persuaded.

### 1.   Applicable Law and Standard of Review

Under section 425.16, a defendant may move to strike claims " 'arising from any act … in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) Section 425.16 does not completely insulate a defendant's protected speech; rather, it provides a mechanism "for weeding out, at an early stage, *meritless* claims arising from" protected activity. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

6

Courts apply a two-prong test when evaluating an anti-SLAPP motion. (*Baral*, *supra*, 1 Cal.5th at p. 384.) "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16." (*Ibid*.) To determine whether the plaintiff's causes of action arise from the defendant's protected activity, we look at the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); see also *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

If the defendant meets that burden, the plaintiff then must "demonstrate the merit of the claim by establishing a probability of success." (*Baral*, *supra*, 1 Cal.5th at p. 384.) The second prong involves an analysis similar to that used to evaluate a summary judgment motion. (*Ibid*.) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [The court] accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Id*. at pp. 384–385.)

We independently review an order granting a special motion to strike under section 425.16. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672.) " ' "[W]e engage in the same, two-step process as the trial court to determine if the parties have satisfied their respective burdens. [Citations.] If the defendant fails to show that the lawsuit arises from protected activity, we affirm the trial court's ruling and need not address the merits of the case under the second prong of the statute." '

[Citation.]" (*Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1298.)

## 2. LaBeouf's conduct does not fall within the scope of the anti-SLAPP statute.

The anti-SLAPP statute protects, among other things, statements or conduct made "in connection with a public issue or an issue of public interest." (See § 425.16, subd. (e)(3)–(4).)[4] To fall within the scope of subdivision (e)(3) and (4) of the anti-SLAPP statute, a defendant must establish: (1) that the challenged statement or conduct implicates a public issue or a matter of public interest; and (2) that the speech or conduct was made "in connection with" a public issue or a matter of public interest. (See § 425.16, subd. (e)(3)–(4); see also *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).)

To determine whether challenged speech or other conduct involves a public issue or a matter of public interest, courts look to "certain specific considerations." (*FilmOn*, *supra*, 7 Cal.5th at p. 145.) For instance, courts look to whether "the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*Id.* at pp. 145–146.)

---

[4] The parties agree the first two categories of protected activity under section 425.16, subdivision (e) do not apply in this case because none of the underlying conduct concerns "a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law[.]" (§ 425.16, subd. (e)(1)–(2).)

" '[P]ublic interest' does not equate with mere curiosity," and "the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy … .' [Citation.]" (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 (*Weinberg*).)

As for the second requirement, the California Supreme Court recently articulated a two-part test to determine whether speech or conduct was made "in connection with" an issue of public interest. (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) "First, we ask what 'public issue or … issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Id.* at pp. 149–150.) The second part of this test "address[es] the specific nature of [the defendant's] speech and its relationship to the matters of public interest." (*Id.* at p. 152.)[5]

LaBeouf contends his celebrity status makes "his day to day conduct 'a public issue or an issue of public interest.' " According to LaBeouf, since footage of him calling Bernstein a racist and physically threatening Bernstein was disseminated on the internet and on television, his conduct must involve a matter

---

[5] While *FilmOn* addressed the meaning of the phrase "in connection with" as it is used in subdivision (e)(4) of section 425.16, we see no reason why the same analysis should not apply when determining whether a statement was made "in connection with" a public issue or a matter of public interest for purposes of subdivision (e)(3) of section 425.16. (See *People v. McCart* (1982) 32 Cal.3d 338, 344 ["When a word or phrase is repeated in a statute, it is normally presumed to have the same meaning throughout."].)

of public interest under section 425.16, subdivision (e)(3) and (4). We disagree.

While courts have held the public's interest in the life and work of entertainers and other celebrities can create an issue of public interest for purposes of section 425.16, subdivision (e) (see *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 678), it is the subject of the defendant's speech or conduct that determines whether an issue of public interest has been implicated for purposes of anti-SLAPP protection. (See *FilmOn*, *supra*, 7 Cal.5th at pp. 145–146.) The defendant's celebrity status, on its own, is not sufficient to render anything the defendant says or does subject to anti-SLAPP protection. (*Id.* at p. 152; see also *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1226 (*D.C.*) ["No authority supports the [defendant's] broad proposition that anything said or written about a public figure or limited public figure in a public forum involves a public issue."].)

Here, LaBeouf's statements—calling Bernstein a "racist"— were not directed at someone in the public eye. Nothing in the record suggests that, prior to this incident, Bernstein was a public figure or had been involved in any issue of public interest. (See *D.C.*, *supra*, 182 Cal.App.4th at p. 1229 [a bully's threats of bodily harm toward fellow student who maintained a website promoting his musical career did not implicate a matter of public interest because the subject of the speech—the fellow student— was not a person in the public eye].)

There is also no evidence that LaBeouf's comments addressed an ongoing controversy or an issue that had garnered any public interest before LaBeouf lashed out at Bernstein. Rather, the statements concerned an isolated dispute between a bartender and an inebriated client over the bartender's refusal to

serve the client alcohol at a restaurant. Indeed, as LaBeouf concedes in his opening brief, the subject of his altercation with Bernstein was "unremarkable and insignificant." (See *Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 936 ["the focus of the speaker's conduct should be the public interest, not a private controversy"].) Although footage of the altercation was later disseminated to many people on the internet and television, a private dispute does not become a matter of public interest simply because it was widely communicated to the public. (*Weinberg, supra,* 110 Cal.App.4th at p. 1133.)

Moreover, the fact that LaBeouf used the word "racist" when confronting Bernstein did not convert the statements into the type of speech entitled to anti-SLAPP protection. It is obvious from the circumstances surrounding LaBeouf's statements that they were not intended to further any public debate on the issue of racism. Rather, the comments were merely part of LaBeouf's tantrum triggered by Bernstein's refusal to serve him and Goth alcohol. Nothing in the record shows Bernstein or any other Jerry's employee had been accused of engaging in racist behavior in the past, and nothing in the video footage of the Jerry's incident supports an inference that Bernstein engaged in any racist behavior before LaBeouf lost his temper. Indeed, in his anti-SLAPP motion, LaBeouf admitted his statements were " 'mere name calling.' " While racism is undoubtedly an issue of public interest, a defendant cannot convert speech that would otherwise not be entitled to anti-SLAPP protection into protected activity by "defining the[] narrow dispute by its slight reference to the broader public issue." (*FilmOn, supra,* 7 Cal.5th at p. 152.) In short, the "content of [LaBeouf's] communication added

11

nothing to any public discourse or interest." (*D.C.*, *supra*, 182 Cal.App.4th at p. 1230, italics omitted.)

This case is distinguishable from *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337 (*Hall*), which LaBeouf relies on to argue his statements are entitled to anti-SLAPP protection. *Hall* arose out of the probate of Marlon Brando's will following the actor's death. (*Id*. at pp. 1341–1344.) After "[a] petition for probate of Brando's will was filed in the Los Angeles Superior Court," the producers of a television program interviewed Brando's retired housekeeper, who was named as a beneficiary in the will. (*Id*. at p. 1342.) After the interview was aired on national television, the housekeeper sued the producers for, among other things, elder abuse and intentional infliction of emotional distress. (*Id*. at p. 1343.)

The trial court in *Hall* denied the producers' anti-SLAPP motion, but the appellate court reversed. (*Hall*, *supra*, 153 Cal.App.4th at pp. 1344, 1346–1348.) The reviewing court held the defendants' conduct was protected under the anti-SLAPP statute because it addressed matters of public interest: Brando's death and the probate of his will, which had garnered significant national media attention in print and on television even before the defendants aired the housekeeper's interview. (*Id*. at p. 1342.) Although the housekeeper did not volunteer to participate in the interview or otherwise make public statements about Brando's will, the reviewing court held she "nevertheless became involved in an issue of public interest by virtue of being named in Brando's will." (*Id*. at p. 1347.) In other words, the housekeeper was a figure of public interest because of her relationship to Brando and the fact that she was a key figure in the probate of his will.

To be sure, *Hall* and this case share some similarities: they each involve a celebrity, and the underlying incidents attracted the media's and the public's attention. But the similarities end there. In *Hall*, the "subjects" of the defendants' conduct—a beneficiary of Brando's will and the execution of that will—were matters of public interest before the defendants recorded and later aired their interview with Brando's housekeeper. And, while the reviewing court did not expressly rely on this fact in reaching its decision, the dispute in *Hall* arose out of an ongoing judicial proceeding: the probate of Brando's will in the Los Angeles Superior Court. Judicial proceedings, by definition, are matters of public interest under the anti-SLAPP statute. (See § 425.16, subd. (e)(2) [any statement made "in connection with" a "judicial proceeding" is a "public issue" entitled to anti-SLAPP protection].) LaBeouf's conduct in this case, on the other hand, involved a purely private dispute that only drew media attention after it occurred.[6]

In any event, even if *Hall* could be read to suggest that a defendant's celebrity status, by itself, converts an otherwise private dispute involving that celebrity into a matter of public interest, we would disagree with that holding. *Hall* was decided more than 10 years before the Supreme Court decided *FilmOn*. As we explained above, *FilmOn* makes clear that the social or celebrity status of a party does not, without more, convert anything that party says into a matter of public interest. Under *FilmOn*, the focus of the "public interest" inquiry "must be on 'the specific nature of the speech,' rather than on any 'generalities

---

[6] We note that LaBeouf does not contend that Bernstein's complaint contains "mixed" causes of action. (*Baral*, *supra*, 1 Cal.5th at p. 395.)

that might be abstracted from it,' " such as the fact that the defendant " 'regularly injects himself in the public spotlight.' " (*FilmOn*, *supra*, 7 Cal.5th at p. 152.)

In sum, neither LaBeouf's statements calling Bernstein a "racist," nor LaBeouf's other conduct during the incident at Jerry's, involved a matter of public interest or concern. Rather, LaBeouf's statements stemmed out of an isolated dispute between himself and Bernstein. The lower court, therefore, properly denied LaBeouf's anti-SLAPP motion.

## DISPOSITION

The order denying LaBeouf's anti-SLAPP motion is affirmed. David Bernstein shall recover his costs on appeal.

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DAVID BERNSTEIN, | B288054 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BC663207 |
| v. | |
| SHIA LABEOUF, | **Order Certifying Opinion for Publication** |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

BY THE COURT:*

      Respondent David Bernstein has requested that our opinion in the above-entitled matter, filed November 19, 2019, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The opinion is ordered published in the Official Reports.

---

*EDMON, P. J.         LAVIN, J.         EGERTON, J.